# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Iota Phi Lambda Sorority, Inc., | Case No. 19-CV-532 (SRN/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| Contenta Global Capital Group, LLC, Cheryl Broussard, individually and as an officer or owner of Cheryl Broussard d/b/a Contenta Global Capital Group, LLC, | |
| Defendants. | |

Damon L. Ward, Ward Law Group, 6200 Excelsior Boulevard, Suite 101, Saint Louis Park, Minnesota, 55416, and Albert T. Goins, Sr., Goings Law Offices, Ltd., 301 Fourth Avenue South, # 378N, Minneapolis, Minnesota, 55415, for Plaintiff.

No appearance by Defendants Contenta Global Capital Group, LLC and Cheryl Broussard.

SUSAN RICHARD NELSON, United States District Judge

The above entitled matter came before the Court on Plaintiff Iota Phi Lambda Sorority, Inc.'s ("IPL") corrected Motion for Default Judgment [Doc. No. 21] against Defendants Contenta Global Capital Group, LLC ("Contenta") and Cheryl Broussard. IPL seeks a default judgment, damages, attorneys' fees, prejudgment interest, postjudgment interest, and costs. Neither Contenta or Broussard have appeared at any point in this litigation, and do not contest the motion. The Court, having carefully reviewed IPL's motion and all of the files, pleadings,

and proceedings herein, makes the following findings of fact, conclusions of law, and order

for judgment.

## FINDINGS OF FACT

## I.    BACKGROUND

### A.    The Lawsuit and Parties

1.    Plaintiff IPL is an Illinois corporation having its principal place of business

in the District of Columbia.  (Compl. [Doc. No. 1] at 1.)  IPL is a sorority with national

membership.  (*Id.* at 2.)

2.    Defendant Contenta is a sole proprietorship owned and operated by

Broussard.  (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-29 (TAV/DCP)

[Doc. No. 25] at 2 (E.D. Tenn. July 16, 2019).)

3.    Defendant Broussard is a natural person residing in Florida.  (Compl. [Doc.

No. 1] at 2.)

4.    The Court has subject matter jurisdiction over this matter under 28 U.S.C.

§§ 1331 (federal question jurisdiction), 1332(a)(1) (diversity jurisdiction), and 1367(a)

(supplemental jurisdiction) (2012).

5.    The Court has personal jurisdiction over Contenta and Broussard.  *See Ins.*

*Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) (noting

that "under Rule 12(h) Federal Rules of Civil Procedure, '[a] defense of lack of jurisdiction

over the person . . . is waived' if not timely raised in the answer or a responsive pleading.").

Here, neither Contenta nor Broussard have appeared, answered, or filed any responsive

pleading contesting personal jurisdiction. Consequently, any defense on such a ground is waived.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b). Neither Contenta nor Broussard have appeared, answered, or filed any responsive pleading contesting venue, and therefore any defense on such a ground is waived. *See* Fed. R. Civ. P. 12(h)(1).

7.     This is an action for violations of the securities laws of the United States, including violations of the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 78j, 77t (2012) and 17 C.F.R. § 240.10b-5 (2019), the Securities Act of 1933, *see* 15 U.S.C. §§ 77l, 77o (2012), and the Investment Advisors Act of 1940, *see* 15 U.S.C. § 80b-1 *et. seq.* (2012). IPL also asserts a host of state-law claims, including negligence, intentional fraud, unjust enrichment, breach of fiduciary duty, aiding and abetting, breach of contract, account stated, equitable accounting, constructive trust, and conversion. (*See generally* Compl. [Doc. No. 1].)

## B.     Facts Underlying The Lawsuit

8.     As an initial matter, the Court notes that when a defendant is in default, the district court accepts as true all of the factual allegations in the complaint except those relating to the amount of damages. *See Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010). Additionally, Broussard has pleaded guilty to one count of wire fraud, based on the same facts below, before the United States District Court for the Eastern District of Tennessee. (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-29 (TAV/DCP) [Doc. No. 25] (E.D. Tenn. July 16, 2019).) Consequently, the following findings of fact are considered true by the Court.

9.     Around 2013, IPL's investment and finance committee began looking for ways to invest some of the organization's funds.  (Compl. [Doc. No. 1] at 2.)  During its search, IPL became aware of Broussard; in 2014, Broussard presented a webinar presentation to certain IPL members seeking to induce IPL to invest funds with Contenta, purportedly under the management of Broussard.  (*Id.*)

10.     During this process, Contenta and Broussard represented themselves to IPL as being in the business of providing investment advice and management.  (*Id.* at 5.)  Specifically, Broussard (and, via Broussard, Contenta) represented to IPL that Broussard and Contenta created "customized portfolios for the world's most sophisticated investors, pension funds, foundations and endowments using the public and private markets," and had an "experienced research team" with "extensive industry experience in portfolio management." (*Id.*)  Defendants further asserted that if IPL invested, Defendants would invest in high quality stocks to double IPL's investment.  (*Id.* at 6.)  None of these representations were true.  (*Id.* at 24.)

11.     To persuade IPL of Contenta's pedigree, Defendants represented that Contenta was a stock market specialist, that both Broussard and Contenta monitored and analyzed "several hundreds of stocks daily for their clients," and that if IPL invested, its portfolio would be "diversified and provide a conservative higher return to build up Plaintiff's accounts during any economic period." (*Id.* at 6.)  Moreover, Defendants assured IPL that its money would be liquid and available from its investment account within two to three business days.  (*Id.* at 6–7.)  Overall, Defendants represented themselves as a "safe, profitable investment and management firm where . . . investors'

funds would be held by an independent third party, closely regulated by U.S. financial authorities, and, in fact, guaranteed under U.S. law." (*Id.* at 7.) None of this was true. (*Id.* at 24.)

12.     As a result of Defendants' assertions, IPL executed an Investment Advisory Agreement ("Agreement") with Defendants on February 11, 2015. (*Id.* at 7.) The Agreement states that Contenta, with Broussard as IPL's adviser, would provide "investment management and account administration services" for IPL so that it could achieve "certain long-term investment goals." (Agreement [Doc. No. 1-1] at 4.) It provided that Contenta will "purchase and sell securities for [IPL's] Account without first consulting with, or obtaining, specific authorization from" the organization. (*Id.*) Through the Agreement, Defendants became IPL's fiduciaries, and were given authority to take custody of IPL's funds in order to invest them. (*Id.* at 5.) Either IPL or Defendants could terminate the Agreement at any time "for any reason . . . upon receipt of written notice of termination . . . ." (*Id.* at 7.) The Agreement did not provide a guarantee of investment success, (*see id.* at 9), but did provide an expected range of annual returns as anywhere from -8% to 20%, (*id.* at 10.)

13.     After entering into the Agreement, IPL was instructed to wire $100,000 to a bank account held in Contenta's name pursuant to instructions from Broussard, who signed the instruction letter above the title "Registered Investment Advisor." (Compl. [Doc. No. 1] at 7; Agreement [Doc. No. 1-1] at 19–20.) IPL sent $100,000 to the bank account specified by Broussard. (Compl. [Doc. No. 1] at 8.) Contenta also charged IPL an annual

$3,000 investment management fee, which IPL paid, totaling $6,000 from 2015 to 2017. (Broussard Indictment [Doc. No. 1-2] at 2–3.)

14.    Instead of investing the funds, Broussard and Contenta used the $100,000 entirely for their own personal benefit; no funds were ever invested. (Compl. [Doc. No. 1] at 7.) To hide this fact, Broussard and Contenta prepared and sent fraudulent financial statements to IPL on a monthly basis, assuring IPL that its investment was profitable. (*Id.* at 8; *see* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-29 (TAV/DCP) [Doc. No. 25] at 3 (E.D. Tenn. July 16, 2019).)

15.    In or about July 2016, IPL decided to terminate its relationship and Agreement with Defendants. (*Id.*) On July 26, 2016, IPL sent Defendants a termination letter pursuant to the terms of the Agreement. (*Id.*) Defendants responded by informing IPL that terminating the agreement "early" would result in a 35% penalty against IPL. (*Id.*) IPL requested an explanation as to the basis for asserting the early-termination penalty, as the Agreement contained no such penalty; no explanation was provided, but IPL permitted the funds to remain with Defendants for an additional six months as a result of Defendants' representation about an early-termination penalty. (*Id.* at 8–9.)

16.    On January 12, 2017, IPL again decided to terminate its relationship and Agreement with Defendants, effective February 11, 2017. (*Id.* at 9.) It sent another termination memorandum requesting that Defendants wire IPL's funds back to IPL's bank account. (*Id.*)

17.    From January 12, 2017 through April of 2017, IPL repeatedly contacted Defendants and requested information as to the status and whereabouts of its funds, in

addition to requesting updates as to when the funds would be returned to IPL. (*Id.*) During that time, Defendants repeatedly provided false assurances, misrepresentations, and excuses for why the funds had not been returned. (*Id.* at 9–10.)

18. On April 26, 2017, Defendants, through Broussard, wrote to IPL and falsely represented that the funds had been wired back to IPL; however, no funds were transferred to any account held by or affiliated with IPL. (*Id.* at 10.) On May 10, 2017, Defendants, through Broussard, stated in writing to IPL that for security reasons, it was having trouble "straightening [IPL's] account out." (*Id.*)

19. From April through August of 2017, IPL sent numerous communications and requests to Defendants requesting information as to the status and location of its investment funds. (*Id.* at 10–13.) Defendants' responses to these communications consisted of lies and excuses regarding delays, passing the blame to third parties, or false assertions that the transfer had already occurred. (*Id.*) Eventually, Defendants stopped responding to IPL's inquiries. (*Id.* at 13.) To date, Defendants have not returned any funds to IPL. (*Id.* at 14.)

20. On its own, IPL investigated Defendants and learned no investment account was ever opened for IPL, and that Broussard was in her fifth bankruptcy. (*Id.* at 13–14.)

21. On February 20, 2019, a grand jury in the United States District Court for the Eastern District of Tennessee indicted Broussard on five counts of wire fraud based on the above conduct. (*Id.* at 14; *see* Broussard Indictment [Doc. No. 1-2].) On July 16, 2019, Broussard admitted to a general version of the above facts and pleaded guilty to one count of wire fraud. (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-29 (TAV/DCP) [Doc. No. 25] (E.D. Tenn. July 16, 2019).)

### C. Service on Defaulting Defendants

22.     IPL served its Complaint on Defendants on March 11, 2019. (*See* Broussard Executed Summons [Doc. No. 8]; Contenta Executed Summons [Doc. No. 9].) Accordingly, Defendants' deadline to respond to the Complaint was April 1, 2019. To date, Defendants have not answered or otherwise responded to the Complaint.

23.     When Defendants failed to answer, IPL filed an application for entry of default. (*See* Doc. No. 11.) On April 15, 2019, the Clerk of Court entered default against Defendants. (*See* Entry of Default [Doc. No. 13].) On June 9, 2019, IPL filed the current corrected Motion for Default Judgment [Doc. No. 21].

## CONCLUSIONS OF LAW

### I.     THE DEFENDANTS ARE IN DEFAULT

1.     Pursuant to Federal Rule of Civil Procedure 55, the Court may enter a default judgment against a defendant against whom a default has been entered for failing to plead or otherwise defend. As noted above, when a defendant is in default, the Court accepts as true all of the factual allegations in the complaint except those relating to damages. *See Murray*, 595 F.3d at 871.

2.     Pursuant to Federal Rule of Civil Procedure 55, there is a two-step process for the entry of a default judgment. *See Johnson v. Dayton Elec. Mfg. Co.*, 140 F.2d 781, 783 (8th Cir. 1988). First, the moving party must seek a default from the Clerk of Court, and the Clerk must enter default based on proof that the opposing party has failed to plead or defend against the action. Fed. R. Civ. P. 55(a). Second, the moving party must seek entry of default judgment from the Court based on either Rule 55(b)(1) (where damages

are sum certain) or Rule 55(b)(2) (in all other cases). *See* Fed. R. Civ. P. 55(b)(1)–(2). Entry of default by the Clerk of Court must precede entry of default judgment. *Johnson*, 140 F.2d at 783.

3. Having been served with the summons and complaint in this action and having failed to answer or otherwise respond to the Complaint, the Defendants are in default. The Clerk of Court has entered a default against Defendants, and IPL has moved for a default judgment. Accordingly, the Court will enter default judgment against the Defendants as provided below.

## II. LIABILITY

4. As noted above, the factual allegations in the Complaint—other than those relating to the amount of damages—are accepted as true.

5. In determining Defendants' liability, the Court must "ensure that 'the unchallenged facts constitute a legitimate cause of action' prior to entering final judgment." *Marshall v. Baggett*, 616 F.3d 849, 852–53 (8th Cir. 2010) (citation omitted). While a default judgment is appropriate where an adversary does not respond to legal proceedings, "the fact that the litigant[s] sued did not respond does not vitiate the [C]ourt's responsibility to do justice[.]" *Am. Cyanamid Co. v. Page*, 66 F.R.D. 143, 145 (D.S.C. 1975). To that end, the Court independently reviews the causes of action in IPL's complaint to ensure that the facts and law applicable to the suit entitle IPL to judgment and relief.

6. The Court applies federal law to IPL's federal claims (counts 1 through 5). IPL's state-law claims—over which the Court possesses both diversity and supplemental jurisdiction—require additional analysis. "Federal courts hearing state law claims under

diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)). Therefore, the Court will first address IPL's state law claims, and determine which state's law applies. It will then address IPL's federal claims.

## A. State-Law Claims (Counts 6 through 16)

7. Where the Court's jurisdiction over a claim is based on diversity or supplemental jurisdiction, the Court "appl[ies] the [forum's] choice-of-law rules in determining which state law governs the issue[s]" before it. *Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786, 796 (8th Cir. 2005) (citation omitted). As such, the Court applies Minnesota choice-of-law rules to determine which state's law applies to the diversity- and supplemental-jurisdiction-based claims in this case. *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007). While IPL has not explicitly asserted that California law applies to the state-law claims in its Complaint, its briefing relies on California law. Consequently, the Court applies Minnesota choice-of-law rules to determine whether California or Minnesota law applies.[1]

8. The Minnesota Supreme Court has generally adopted the "significant contacts" test for choice-of-law analyses. *See Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93–94 (Minn. 2000). The first step—technically a precursor step to a "significant contacts" analysis—is to determine whether a conflict exists between the

---

[1] The Court is aware of no reason why any other state's law should be considered.

laws of the forum (here, Minnesota) and the laws of California. *Id.* (citation omitted). A conflict exists only where "the choice of one forum's law over the other will determine the outcome of the case." *Id.* at 94 (citation omitted). If conflicts exist, the Court must determine whether each state's contacts with the case are constitutionally sufficient such that the state's law could be applied.[2] *Id.* at 94 n.2 (citation omitted).

9. There are no apparent conflicts between California law and Minnesota law with respect to the state law claims asserted by IPL. With respect to count 6, both Minnesota and California law utilize standard negligence elements. *Compare Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. Ct. App. 2007) (setting forth elements of negligence claim), *with Peredia v. HR Mobile Servs., Inc.*, 236 Cal. Rptr. 3d 157, 162 (Cal. Ct. App. 2018) (setting forth elements of negligence claim). To the extent IPL's complaint can be construed as asserting a cause of action for "professional" negligence, each state is still in accord. *Compare Valley Paving, Inc. v. Stanley Consultants, Inc.*, No. A15-1321, 2016 WL 2615956, at *5 (Minn. Ct. App. May 9, 2016) (setting forth the elements of professional negligence), *with Hasso v. Hapke*, 173 Cal. Rptr. 3d 356, 394 (Cal. Ct. App. 2014) (setting forth elements of professional negligence), *rev. denied* (Cal. Oct. 22, 2014). Both states also share the same elements for intentional fraud claims (count 7). *Compare U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011) (setting forth elements of intentional fraud claim), *with Tenet Healthsystem Desert, Inc. v. Blue*

---

[2]     IPL has provided no facts, and Court is aware of none, that indicate Minnesota's contacts with the case are sufficient such that Minnesota *substantive* law could be constitutionally applied. In fact, from a review of the record, it does not appear that Minnesota has any real connection to the litigants or the subject matter of this case.

*Cross of California*, 199 Cal. Rptr. 3d 901, 914–15 (Cal. Ct. App. 2016) (setting forth largely identical elements of intentional fraud claim, also termed an action for "deceit").

10. California courts are split over whether unjust enrichment (count 8) exists as a standalone cause of action, while Minnesota recognizes unjust enrichment as a claim. *Compare Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007) (setting forth elements of unjust enrichment claim), *with Lyles v. Sangadeo-Patel*, 171 Cal. Rptr. 3d 34, 40 (Cal. Ct. App. 2014) (setting forth substantially similar elements of unjust enrichment claim), *and O & M LLC v. Wells Fargo Bank, N.A.*, No. G052840, 2017 WL 1534666, at *6 (Cal. Ct. App. Apr. 28, 2017) (noting that "California courts are split on whether a separate cause of action for unjust enrichment exists"). In any case, however, this split in authority is irrelevant because California has explicitly held that "[a]n unjust enrichment theory is inapplicable" where the plaintiff alleges that the parties entered into an express contract. *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Cal. Ct. App. 2010). Because IPL asserts Defendants breached an express contract between the parties, and because (for the reasons discussed below) the Court finds IPL has proven that claim, IPL is barred from asserting an unjust enrichment claim. Therefore, any apparent conflict between Minnesota and California over whether unjust enrichment is a valid independent cause of action is irrelevant.

11. Both California and Minnesota also use the same general breach of fiduciary duty elements (count 9). *Compare TCI Bus. Capital, Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 434 (Minn. Ct. App. 2017) (setting forth elements of breach of fiduciary duty claim), *with IIG Wireless, Inc. v. Yi*, 231 Cal. Rptr. 3d 771, 787 (Cal. Ct.

App. 2018) (setting forth elements of breach of fiduciary duty claim). Similarly, both states utilize the same elements on aiding and abetting claims (counts 10 and 11), as well as breach of contract claims (count 12). *Compare Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (setting forth elements of an aiding and abetting tortious conduct claim), *and Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (setting forth elements of breach of contract claim), *with Casey v. U.S. Bank Nat. Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005) (setting forth elements of an aiding and abetting tortious conduct claim), *and Coles v. Glaser*, 205 Cal. Rptr. 3d 922, 927 (Cal. Ct. App. 2016) (setting forth elements of a breach of contract claim).

12. The same goes for IPL's account stated claim (count 13), *compare Mountain Peaks Fin. Servs., Inc. v. Roth-Steffen*, 778 N.W.2d 380, 387 (Minn. Ct. App. 2010) (setting forth elements of an account stated claim), *with Leighton v. Forster*, 213 Cal. Rptr. 3d 899, 918 (Cal. Ct. App. 2017) (setting forth elements of an account stated claim), equitable accounting claim (count 14), *compare United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equipment, LLC*, 813 N.W.2d 49, 57 n.3 (Minn. 2012) (discussing the remedy of equitable accounting), *with Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 859 (Cal. Ct. App. 2014) (discussing equitable accounting claims), constructive trust claim (count 15), *compare Peterson v. Holiday Recreational Indus., Inc.*, 726 N.W.2d 499, 507 (Minn. Ct. App. 2007)) (setting forth constructive trust claim requirements), *with Optional Capital, Inc. v. DAS Corp.*, 166 Cal. Rptr. 3d 705, 715 (Cal. Ct. App. 2014), and conversion claim (count 16), *compare Staffing Specifix, Inc. v. TempWorks Mgmt. Servs.,*

*Inc.*, 896 N.W.2d 115, 125 (Minn. Ct. App. 2017) (setting forth elements of common law conversion claim), *with Prakashpalan*, 167 Cal. Rptr. 3d at 857 (setting forth elements of common law conversion claim).

13.     Because Minnesota and California law are, where relevant, essentially the same, the Court could apply either state's substantive law.  Because IPL asserts California law applies, and because there are no objections, the Court will apply California law to IPL's state-law claims.

### 1.     Count 6 – Negligence

14.     In count 6 of its complaint, IPL asserts a common-law negligence claim against Defendants.  (*See* Compl. [Doc. No. 1] at 23.)  Specifically, IPL contends that during the term of its Agreement with Defendants, both Contenta and Broussard owed an independent duty to IPL to use such "skill, prudence, and diligence as other members of their profession commonly possess and exercise" and that they breached that duty by mispresenting their pedigree and stealing IPL's funds.  (*Id.* at 7–8, 23.)

15.     Under California law, "any negligence cause of action" requires the plaintiff to show "duty, breach of duty, proximate cause, and damages." *Peredia*, 236 Cal. Rptr. 3d at 162 (citation omitted).  To the extent IPL's claim is one for professional negligence, it must show: " '(1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence.' " *Hasso*, 173 Cal. Rptr. 3d at 394 (citation omitted).  Under California law, an "investment

adviser/client relationship . . . giv[es] rise to a fiduciary duty as a matter of law." *Id.* at 384 (citing *S.E.C. v. Capital Gains Bureau*, 375 U.S. 180, 191, 194 (1963)).  A fiduciary duty requires the fiduciary to " 'act with the utmost good faith for the benefit of the other party' " and must not take any " 'advantage from his acts relating to the interest of the other party with the latter's knowledge or consent.' " *In re Marriage of Duffy*, 11 Cal. Rptr. 2d 160, 168 (Cal. Ct. App. 2001) (citations omitted).

16.　　Based on the findings of fact above, and the allegations in IPL's complaint, the Court finds that Defendants owed a fiduciary duty to IPL as both a matter of law, *see Hasso*, 173 Cal. Rptr. 3d at 394 (citation omitted), and under the terms of the party's Investment Advisory Agreement, (*see, e.g.*, Agreement [Doc. No. 1-1] at 4.)  As a fiduciary, Defendants owed an even higher standard of care to IPL than under negligence principles.  Defendants breached that duty by putting themselves and their interests before IPL and absconding with its investment funds, directly causing financial harm to IPL. Accordingly, the Court holds that IPL has proven that Defendants were negligent—indeed, they were more than negligent—and will grant IPL default judgment on count 6.

### 2.　　Count 7 – Intentional Fraud

17.　　In count 7 of its complaint, IPL asserts that Defendants intentionally defrauded IPL by making numerous misrepresentations about Defendants' qualities as investment advisers and Defendants' intent for IPL's investment funds, with the goal of inducing IPL to invest through Defendants.  (Compl. [Doc. No. 1] at 23–24.)  IPL claims that all of Defendants' representations were false, that Defendants knew they were false at the time they were made, and that Defendants intended to provide "no consideration or

value to [IPL]" and instead intended to "deceive and defraud [IPL]" after inducing it to invest. (*Id.* at 24–25.)

18.      Under California law, an action for intentional fraud (also termed a "tort action for deceit") requires a plaintiff to prove " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (3) resulting damage.' " *Tenet Healthsystem Desert, Inc.*, 199 Cal. Rptr. 3d at 914–15 (citation omitted). Fraud must be "pled specifically . . . [and] necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " *Id.* at 915 (citation omitted).

19.      The Court finds that Defendants intentionally defrauded IPL. IPL has proven that Defendants falsely represented to IPL that they were experienced investment advisers, stock market specialists, and they would and could manage IPL's investments for the organization. (Compl. [Doc. No. 1] at 5–6.) Defendants also falsely represented to IPL that if IPL invested under their guidance, IPL's portfolio would be diversified, provide a higher conservative return, and would remain liquid and accessible. (*Id.* at 6–7.) Further, Defendants misrepresented that any funds IPL provided for investment purposes would be held by a third-party custodian, and that Defendants would carefully manage IPL's investment under fiduciary standards. (*Id.* at 7.) IPL contends—and again, this Court takes as true—that Defendants knew each and every representation was false and intended to defraud IPL by inducing it to invest through Defendants so that Defendants could steal IPL's funds for their own benefit. (*Id.* at 7–8, 24–25.) IPL did in fact rely on Defendants'

misrepresentations, placed its investment funds in their hands, and lost its entire investment when Defendants stole their funds for their own benefit. (*Id.* at 7–8.)

20.     Finally, IPL's reliance on Defendants' misrepresentations was reasonable and justified. Under California law, reasonable reliance exists if the person who claims reliance was "justified in believing the [false] representation in the light of his own knowledge and experience." *Gray v. Don Miller & Assocs., Inc.*, 674 P.2d 253, 254 (Cal. 1984). Here, the facts indicate that Defendants made multiple representations of investment expertise, presented IPL with a formal investment advisory contract, and engaged in widespread, consistent misrepresentation as to Defendants' financial savvy and experience both before and after IPL decided to hire Defendants. There are no facts indicating IPL had experience with investing. And while the Court considers Defendants' representation to IPL that it would "double" IPL's funds to be a red flag that a reasonable person may have investigated, California law specifically holds that "[n]egligence *on the part of the plaintiff* in failing to discover the falsity of a statement *is no defense* when the misrepresentation was intentional"—like the case here—"rather than negligent." *Alliance Mortg. Co. v. Rothwell*, 900 P.2d 601, 609 (Cal. 1995) (emphasis added). Consequently, the intentional nature of Defendants' fraud renders irrelevant any negligence by IPL in relying on Defendants.

21.     Accordingly, the Court holds that IPL has proven that Defendants engaged in intentional fraud against IPL and will grant default judgment on count 7.

### 3. Count 8 – Unjust Enrichment

22. In count 8 of its complaint, IPL asserts an unjust enrichment claim against Defendants. (Compl. [Doc. No. 1] at 25.) As noted above, however, California courts are split over whether unjust enrichment exists as a standalone cause of action. *See, e.g.*, *Lyles*, 171 Cal. Rptr. 3d at 40; *O & M LLC*, 2017 WL 1534666, at *6. In any case, however, this split in authority is irrelevant because California has explicitly held that "[a]n unjust enrichment theory is inapplicable" where the plaintiff alleges that the parties entered into an express contract. *Durell*, 108 Cal. Rptr. 3d at 699. Because IPL has also brought a breach of contract claim, and because the Court (for the reasons discussed below) finds IPL has proven that claim, IPL is barred from recovering under an unjust enrichment theory even if California would permit it as an independent claim. Accordingly, the Court will not grant IPL default judgment on count 8.

### 4. Count 9 – Breach of Fiduciary Duty

23. In count 9 of its complaint, IPL asserts that it was in a fiduciary relationship with Defendants, that Defendants owed IPL a duty of absolute good faith and loyalty, and that Defendants breached that duty by stealing IPL's investment funds for their own benefit. (Compl. [Doc. No. 1] at 27–28.)

24. Under California law, the elements of a cause of action for breach of fiduciary duty are: " '(1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach.' " *IIG Wireless, Inc.*, 231 Cal. Rptr. 3d at 787 (citation omitted). As noted above, California law also establishes that an "investment adviser/client relationship . . . giv[es] rise to a fiduciary duty as a matter of law." *Hasso*,

173 Cal. Rptr. 3d at 384 (citing *Capital Gains Bureau*, 375 U.S. at 191, 194). A fiduciary duty requires the fiduciary to " 'act with the utmost good faith for the benefit of the other party' " such that the fiduciary must not take any " 'advantage from his acts relating to the interest of the other party with the latter's knowledge or consent.' " *In re Marriage of Duffy*, 11 Cal. Rptr. 2d at 168 (citations omitted).

25.     Based on the findings of fact above, the Court finds that Defendants owed IPL a fiduciary duty, breached that duty, and that their breach proximately caused IPL to suffer damage. Defendants held themselves out to IPL as investment advisers, and eventually entered into an Investment Advisory Agreement with IPL. (*See* Compl. [Doc. No. 1] at 5–8.) That alone, under California law, establishes the existence of a fiduciary duty. *See Hasso*, 173 Cal. Rptr. 3d at 384. Beyond that, however, Defendants explicitly acknowledged their fiduciary obligations to IPL in the Agreement. (*See* Agreement [Doc. No. 1-1] at 4.) By stealing IPL's funds, Defendants failed to act with the utmost good faith towards IPL and breached their fiduciary obligations. Moreover, as a direct result, IPL lost at least $100,000. Accordingly, the Court finds that IPL has proven that Defendants breached their fiduciary duty to IPL and will grant default judgment on count 9.

### 5.     Counts 10 & 11 – Aiding and Abetting

26.     In counts 10 and 11 of its complaint, IPL contends that Broussard aided and abetted Contenta (count 10), and that Contenta aided and abetted Broussard (count 11), in intentionally defrauding IPL. (Compl. [Doc. No. 1] at 28–30.) IPL contends that Broussard directly solicited the wiring of IPL's investment funds to Contenta despite having knowledge of the fact that the funds were going to be stolen. (*Id.* at 29.) Moreover,

IPL asserts that Contenta assisted Broussard's efforts to steal IPL's funds by receiving the funds while knowing that they would be used by Broussard for her own personal use and not for the purpose of purchasing and managing securities. (*Id.* at 30.)

27.     California utilizes "the common law rule" for subjecting a defendant to liability for aiding and abetting a tort. *Casey*, 26 Cal. Rptr. 3d at 405. " 'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered constitutes a breach of duty to the third person.' " *Id.* (citation omitted).

28.     However, Contenta is not a separate legal entity from Broussard—it is a sole proprietorship. (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-00029 (TAV/DCP) [Doc. No. 25] at 2.) Under California law, a sole proprietorship is "not a legal entity separate from its individual owner" and therefore Broussard and Contenta are, where relevant, one and the same. *See Montgomery Sansome LP v. Rezai*, 139 Cal. Rptr. 3d 181, 189 (Cal. Ct. App. 2012).

29.     One cannot be held liable for aiding and abetting himself or herself; indeed, the whole point of the claim is that the offending party has aided and abetting *someone else* in their tortious acts. *See White v. Amedisys Holding, LLC*, No. 3:12-CV-01773-ST, 2012 WL 7037317, at *5 (D. Or. Dec. 18, 2012). And while, for example, "[a] corporate entity . . . can be held liable for committing unlawful employment practices against its employees . . . based only on the actions of its agents and employees acting on its

behalf . . . [t]he situation is different if the employee is legally equivalent to the employer" such as in a "sole proprietorship."  *Id.* In that situation, "the employee *would be aiding and abetting himself or herself.*"  *Id.* (emphasis added).  Here, Contenta is a sole proprietorship, through which Broussard acted.  Consequently, neither Contenta nor Broussard could have aided and abetted each other because they were one and the same.

30.     Accordingly, the Court finds that IPL cannot, as a matter of law, state a claim for aiding and abetting against either Contenta or Broussard.  As such, the Court will not grant default judgment on counts 10 and 11.

### 6.     Count 12 – Breach of Contract

31.     In count 12 of its complaint, IPL alleges Defendants breached its Investment Advisory Agreement with IPL by "failing to invest, segregate, and safeguard funds as promised, and failing to repay the principal, dividends, gains, and the accrued interests in accordance with the contract."  (Compl. [Doc. No. 1] at 31.)

32.     Under California law, the elements for a cause of action for breach of contract are: " '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' "  *Coles*, 205 Cal. Rptr. 3d at 927 (citation omitted).

33.     Based on the findings of fact above, the Court finds that Defendants breached their contract with IPL.  IPL has established that it entered into a contract with Defendants—the Investment Advisory Agreement—whereby IPL would invest funds through Defendants for the purpose of purchasing securities, and Defendants would manage the investments and repay the principal, dividends, gains, and accrued interest.

(Compl. [Doc. No. 1] at 31; *see* Agreement [Doc. No. 1-1] at 4.)  Moreover, IPL established that it performed all conditions precedent to Defendants' performance by paying Defendants $6,000 in management fees and by wiring an initial $100,000 to Defendants so that it could be invested.  (*See* Compl. [Doc. No. 1] at 31; Agreement [Doc. No. 1-1] at 2 (requiring fee amounting to 3% of assets under management each year); *see also* Ward Decl. Ex. 3 [Doc. No. 18-3] ($3000 management fee for 2015); Ward Decl. Ex. 4 [Doc. No. 18-4] ($100,000 investment funds); Ward Decl. Ex. 5 [Doc. No. 18-5] ($3,000 management fee for 2016).)  Instead of investing and managing IPL's funds, Defendants stole IPL's $100,000 (and $6,000 in management fees) for their own personal benefit.  (Compl. [Doc. No. 1] at 7–8 (did not invest and instead used funds for Defendants' personal benefit), 31 (failed to invest), 34 (converted funds for Defendants own use).)  Finally, IPL has established that it was harmed by the loss of all $100,000 in investment funds, as well as the $6,000 in management fees paid to Defendants.  (*Id.* at 31–32.)

34.     Accordingly, the Court finds that IPL has proven that Defendants breached their Agreement with IPL and will grant default judgment on count 12.

### 7.     Count 13 – Account Stated

35.     In count 13 of its complaint, IPL asserts a cause of action for account stated.  (Compl. [Doc. No. 1] at 32.)  Specifically, IPL contends that "[a]n account was stated by and between Defendants and Plaintiff wherein it was agreed that Defendants would be indebted to [IPL] in the amount set forth in each of the (sic) Investment Advisory Agreement."  (*Id.*)  It also asserts that Defendants promised to pay IPL "in the amount of

the principal invested, together with dividends, gains, and the accrued interest in accordance with the contract." (*Id.*)

36.     Under California law, " '[a]n account stated is an agreement, based on prior transactions between the parties, that the items of an account are true and the balance struck is due and owing.' " *Leighton*, 213 Cal. Rptr. 3d at 918 (citation omitted). The essential elements are: " '(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; [and] (3) a promise by the debtor, express or implied, to pay the amount due.' " *Id.* (citation omitted). "The key element in every [account stated action] is agreement on the final balance due," *Maggio, Inc. v. Neal*, 241 Cal. Rptr. 883, 888 (Cal. Ct. App. 1987) (citation omitted), which can be implied where "a statement is rendered to a debtor and no reply is made in a reasonable time," *id.* (citation omitted); *see Trafton v. Youngblood*, 442 P.2d 648, 654 (Cal. 1968) (" 'If the account be sent to the debtor and he do not object to it within a reasonable time, his acquiescence will be taken as an admission that the account is truly stated.' " (citation omitted)). Still, "an account stated does not operate as an estoppel, but may be impeached for fraud or mistake; and if either of those elements are pleaded, and the evidence adduced in support of the pleading proves that there has been any mistake, fraud, or undue advantage, by which the account is in truth vitiated, and the balance incorrectly fixed, the account is not conclusive upon the parties." *Budd v. Hough*, 279 P. 1074, 1075 (Cal. Dist. Ct. App. 1929).

37.     Based on the foregoing facts, the Court finds that IPL has not proven a cause of action for account stated. While the evidence establishes a fiduciary relationship

between the parties—under which Defendants were obligated to return the funds it was managing to IPL upon demand—IPL has also established that Defendants lied about investing its $100,000, and consequently, has proven that no such investment (or accompanying investment earnings or dividends) was made. (*See* Compl. [Doc. No. 1] at 7–8 ("[N]one of the investment dollars were ever placed with TD Ameritrade and, in fact, no investments were made; the investment funds instead were used in their entirety for the personal benefit of Defendants . . . .").) Therefore, even assuming that Defendants' communications to IPL agreeing to return it investment funds (and purportedly increased investment earnings) was an agreement on the amount owed, IPL has demonstrated that the "amount owed" at that point—to the extent it exceeded $100,000—was entirely false, as Defendants' financial statements were fraudulent. Put another way, IPL's own evidence demonstrates that any amount above $100,000 that Defendants agreed to return was itself an incorrect amount. Because the final balance due, which is "[t]he key element" in every account stated action, *see Maggio, Inc.*, 241 Cal. Rptr. at 888, has been shown to be based on "mistake, fraud, or undue advantage . . . the balance [is] incorrectly fixed, [and] the account is not conclusive upon the parties." *Budd*, 279 P. at 1075. Accordingly, the Court will not grant IPL default judgment on count 13.

## 8. Count 14 – Equitable Accounting

38.     In count 14 of its complaint, IPL asserts that it is entitled to an equitable accounting[3] because IPL's investments have been commingled with, and dissipated through, Defendants' own funds.  (Compl. [Doc. No. 1] at 32–33.)  It contends that it is unaware of the extent of the dissipation and full nature of the disposition of its funds and asks the Court to order Defendants to account for IPL's funds.  (*Id.* at 33.)

39.     Under California law, "[a]n accounting is an equitable proceeding which is proper where there is an unliquidated and unascertained amount owing that cannot be determined without an examination of the debits and credits on the books to determine what is due and owing."  *Prakashpalan*, 167 Cal. Rptr. 3d at 859 (citation omitted).  To obtain an equitable accounting, a plaintiff "must show the legal remedy is inadequate . . . [because] if an ascertainable sum is owed, an action for an accounting is not proper."  *Id.* (citations omitted).  In the context of a fiduciary relationship, "[a]n accounting is necessary where the fiduciary becomes liable for various sums of money and plaintiffs *do not know what money is due them*."  *Van de Kamp v. Bank of Am.*, 251 Cal. Rptr. 530, 553 (Cal. Ct. App. 1988) (emphasis added) (citation omitted).

40.     The Court finds that IPL has failed to state a claim for equitable accounting.  IPL's complaint fails to allege that it does not know *how much* it is owed from Defendants; indeed, its Motion for Default Judgment claims specific, particularized damages.  (*See* IPL

---

[3]     IPL titled this count "Account Stated," but asks for "the equitable remedy of accounting" from the Court.  (Compl. [Doc. No. 1] at 33.)  Consequently, the Court treats count 14 as an equitable accounting claim.

Corrected Mot. for Default J. [Doc. No. 21] at 1.)  Instead, IPL's complaint alleges that it is unaware "of the extent of the dissipation and the full nature of the disposition of the funds invested . . . ." (Compl. [Doc. No. 1] at 33.)  Moreover, under count 14, IPL demands information on "the nature of [Defendants'] transactions and dispositions" because IPL cannot obtain that information "without an accounting from Defendants." (*Id.*)  As such, IPL's complaint reads more like a demand for documentation establishing precisely *what* Defendants did with IPL's funds, and *where* the funds are now, but not a demand for information tending to establish *how much* Defendants owe IPL.  Consequently, IPL has failed to state a claim for equitable accounting.  Indeed, to the extent IPL seeks information on where its money has gone, it has a legal remedy in the form of post-judgment discovery. *See, e.g.*, Fed. R. Civ. P. 69(a)(2) (authorizing post-judgment discovery "as provided in [the Federal Rules of Civil Procedure] or by the procedure of the state where the court is located").  Moreover, Broussard herself has committed to providing detailed information as to "all assets in which [Broussard[ has any interest or over which [Broussard] exercises control, including those held by a . . . third party" as a result of her plea agreement. (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-00029 (TAV/DCP) [Doc. No. 25] at 6.)  As such, the Court will not grant default judgment on count 14.

### 9.    Count 15 – Constructive Trust

41.    In count 15 of its complaint, IPL asserts that Defendants' fraud and misconduct establish a constructive trust and Defendants are holding IPL's funds as trustees for the benefit of IPL. (Compl. [Doc. No. 1] at 33–34.)

42.     Under California law, "[a] constructive trust may be imposed in practically any case where there has been a wrongful acquisition or detention of property to which another is entitled, but the party attempting to establish the constructive trust must establish the claim by clear and convincing evidence." *Optional Capital, Inc.*, 166 Cal. Rptr. 3d at 715 (citation omitted) (internal quotation marks omitted). "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civil Code § 2223 (West 2019). Additionally, "[o]ne who gains a thing by fraud, . . . the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civil Code § 2224 (West 2019). A beneficiary under a constructive trust may "obtain a money judgment in lieu of a destroyed res" or "recover the value of trust property commingled by a constructive trustee with his own properties . . . ." *Elliott v. Elliott*, 41 Cal. Rptr. 686, 688 (Cal. Dist. Ct. App. 1964) (citation omitted).

43.     Based on the above facts, and other conclusions of law, the Court finds that IPL has proven its claim for a constructive trust. As noted above (and in the damages discussion below), IPL has proven that Defendants intentionally defrauded it out of $106,000—the investment funds IPL sent to Defendants and management fees paid by IPL. (Compl. [Doc. No. 1] at 7–8.) Moreover, as discussed below, IPL has also proven that Defendants wrongfully converted IPL's funds for their own use. (*Id.*) And IPL has established that Defendants have not returned any of its funds. (*Id.* at 13.) Accordingly, the Court grants IPL default judgment on count 15 and imposes a constructive trust over

the $106,000 investment funds, under which IPL is the beneficiary, and Defendants are involuntary trustees.

### 10. Count 16 – Conversion

44. In count 16 of its complaint, IPL asserts that Defendants converted its investment funds for their own use. (Compl. [Doc. No. 1] at 34.) Specifically, it asserts that Defendants improperly assumed "the right of ownership over [IPL's] monetary property" and "converted [IPL's] money to their own use." (*Id.*)

45. Under California law, the elements of a conversion claim are "(1) the plaintiff's ownership or right to possession of the property at the time of the conversion, (2) the defendants' conversion by a wrongful act or disposition of property rights, and (3) damages." *Prakashpalan*, 167 Cal. Rptr. 3d at 857 (citation omitted) (internal quotation marks omitted). A defendant converts funds where he or she "assum[es] [] control or ownership of the property . . . appl[ying] the property to his [or her] own use." *Id.* (citation omitted) (internal quotation marks omitted).

46. The Court finds that IPL has proven its claim for conversion against Defendants. It has established that it sent $106,000 to Defendants, who subsequently converted those funds for their own use. (*See* Compl. [Doc. No. 1] at 7–8.) Broussard has pleaded guilty to that fact. (*See* Plea Agreement, *United States v. Broussard*, No. 3:19-CR-00029 (TAV/DCP) [Doc. No. 25] at 3.) Defendants have not returned any funds to IPL either. Consequently, all the elements of a conversion claim have been proven (and indeed, admitted), and the Court will grant IPL judgment on count 16.

### 11. Summary

47.     For the above reasons, the Court grants IPL default judgment on counts 6 (negligence), 7 (intentional fraud), 9 (breach of fiduciary duty), 12 (breach of contract), 15 (constructive trust), and 16 (conversion), but not on counts 8 (unjust enrichment), 10 and 11 (aiding and abetting), 13 (account stated), and 14 (equitable accounting).

### B.     Federal Law Claims (Counts 1 through 5)

48.     The Court applies federal law to IPL's federal securities claims (counts 1 through 5).   In doing so, the Court must ensure each claim is " 'a legitimate cause of action' " before entering default judgment.   *Marshall*, 616 F.3d at 852–53.

### 1.     Count 1 – Violation of 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5

49.     In count 1 of its complaint, IPL asserts that both Defendants violated 15 U.S.C. § 78j (Section 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. § 240.10b-5 (Rule 10b-5) by knowingly—with the intent to deceive, manipulate, or defraud IPL—soliciting and accepting investment money from IPL while failing to (1) inform IPL that Defendants were not registered with the State of California, or anywhere else, to sell securities; (2) inform IPL that the accounts/securities in which IPL was investing were dependent upon contribution of new money from other investors; and (3) inform IPL that Defendants were simply planning on stealing IPL's money.   (*See* Compl. [Doc. No. 1] at 15.)   IPL also contends that it is entitled to a presumption of reliance because Defendants "perpetrated a fraudulent Ponzi scheme on unwitting investors, and no reasonable actor would choose to 'invest' in a fraudulent Ponzi scheme that aimed simply to steal investors' moneys."   (*Id.* at 16.)

50.     Pursuant to 15 U.S.C. § 78j(b), it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . ."

51.     The Securities and Exchange Commission (SEC) has promulgated Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5), which states that it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails" to employ "any device, scheme, or artifice to defraud . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" or "engage in any act, practice, or course of business which operates as a fraud or deceit upon any person" in connection with the purchase or sale of a security.  SEC Rule 10b-5 prohibits only conduct already prohibited by Section 10(b).  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted).

52.     In a typical private action under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157 (citing *Dura Pharm., Inc. v. Broudo*, 544

U.S. 336, 341–42 (2005)).  Investment advisers can be held liable under Section 10(b) so long as they are the party that actually "makes" the material misrepresentation or omission, in addition to satisfying the other elements of a section 10(b) action.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding an investment adviser was not liable under section 10(b) because it did not "make" a misleading or false statement).  Importantly, where an investment advisor accepts payment for securities that he or she never intends to deliver, that advisor has still engaged in conduct "in connection with the purchase or sale of a security" in violation of Section 10(b) and Rule 10b-5.  *See S.E.C. v. Zandford*, 535 U.S. 813, 819–20 (2002) (finding reasonable an SEC interpretation of the Securities Exchange Act that holds brokers liable under Section 10(b) and Rule 10b-5 when they "accept[] payment for securities that [they] never intend[] to deliver").

53.    A plaintiff bringing a cause of action under Section 10(b) and Rule 10b-5 is subject to heightened pleading requirements.  *See* 15 U.S.C. § 78u-4(b) (2012).  Specifically, plaintiffs that allege that a defendant made "an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading" are required to "specify [in their complaint] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.* at § 78u-4(b)(1).  Moreover, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *see id.* at § 78u-4(b)(2)(A), namely "scienter" in the form of

proof of knowing, intentional, or reckless "practices to deceive, manipulate, or defraud," *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1534 (8th Cir. 1996) (citations omitted). Put succinctly, a plaintiff must allege the "who, what, when, where, and how" of the alleged misleading statements. *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010) (citation omitted) (internal quotation marks omitted).

54.     Based on the findings of fact noted above, the Court finds that IPL has proven Defendants violated Section 10(b) and Rule 10b-5 and is entitled to default judgment on count 1.  It has demonstrated that Defendants made numerous material misrepresentations to IPL, including that Defendants were in the business of creating and managing investment portfolios, were "experienced" in investment matters, and were "stock market specialist[s]" who analyzed several hundreds of stocks daily for their clients.  (Compl. [Doc. No. 1] at 5–6.)  Defendants told IPL that they would double IPL's investment, that its investment would be liquid and available within two to three days of any demand, and that if IPL invested with Defendants, their funds would be "held by an independent third party, closely regulated by U.S. financial authorities, and, in fact, guaranteed under U.S. law." (*Id.* at 6–7.)  Every single one of these representations was definitively false at the time they were made.  (*Id.* at 24.)  The representations were certainly material: Defendants claimed expertise and professionalism, and promises of financial success, which were directly relevant to inducing IPL to invest through Defendants.  And the representations were in connection with the purchase or sale of securities; indeed, they were done entirely to induce IPL to invest through Defendants.

55.     Defendants made those representations to IPL with the requisite scienter in connection with the purchase or sale of a security—namely, specific intent to defraud IPL by taking its funds intended for investment and appropriating them for personal purposes. (*Id.* at 7–8.)  IPL relied upon Defendants' false statements to enter into an Investment Advisory Agreement giving Defendants control over IPL's funds for investment purposes. (*Id.* at 7; Agreement [Doc. No. 1-1] at 4–5.)  IPL incurred economic loss—and has provided documentation for that economic loss—when it wired $100,000 in investment funds to Defendants for use under the Agreement, (Compl. [Doc. No. 1] at 7; Agreement [Doc. No. 1-1] at 19–20; Ward Decl. Ex. 4 [Doc. No. 18-4]), and paid an additional $6,000 in management fees for two years of investment management services, (Ward Decl. Ex. 3 [Doc. No. 18-3]; Ward Decl. Ex. 5 [Doc. No. 18-5].)  Finally, IPL's loss was directly caused by Defendants' theft of the entirety of the funds for their personal benefit; no funds were ever invested and were instead taken for Defendants' personal benefit.  (Compl. [Doc. No. 1] at 7; *id.* at 13 (explaining that TD Ameritrade, the third-party in which IPL's funds were supposedly being held, had "no record of any account for [IPL] or of any funds invested or held in its behalf or benefit").)  In fact, to continue their deception for two years, Defendants forged and transmitted monthly fraudulent financial statements purportedly showing IPL that its investments were profitable when no investments had been made.  (*Id.* at 8; Ward Decl. Ex. 6 [Doc. No. 18-6].)

56.     As such, the Court holds that IPL has demonstrated the "who, what, when, where, and how" of Defendants' scheme and has established that Defendants violated

Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Accordingly, the Court grants IPL judgment on count 1.

### 2. Count 2 – Violation of 15 U.S.C. §§ 77l

57. In count 2 of its complaint, IPL asserts that Defendants violated 15 U.S.C. § 77l (Section 12(a) of the Securities Act of 1933) by "fail[ing] to file any registration statement as to the securities that they allegedly sold to [IPL]" and by offering and selling those securities to Plaintiff through the use of interstate communication and the mails. (Compl. [Doc. No. 1] at 17.) Due to limitations in the reach of the Securities Act of 1933, however, the Court holds that IPL has failed as a matter of law to state a claim against Defendants under 15 U.S.C. § 77l.

58. Pursuant to 15 U.S.C. § 77l:

> [A]ny person who . . . offers or sells a security in violation of section 77e of this title, or . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

59. The statute sets forth two liability tracks. Under the first, any person who offers or sells a security "in violation of section 77e of this title," is liable. *Id.* at 15 U.S.C. § 77l(a)(1). Section 77e requires, among other things, that a registration statement be on file with the SEC prior to the sale of any security (absent the applicability of some exemption). 15 U.S.C. § 77e(c) (2012).

60.     IPL asserts this provision has been violated because Defendants failed to file any registration statement as to the securities that they allegedly sold IPL.  (Compl. [Doc. No. 1] at 17.)  However, aside from the fact that IPL also asserts that no securities were ever purchased by Defendants, (*see id.* at 7–8), IPL's claim misses the mark on a foundational basis:  Defendants, as investment advisers and not issuers, had no obligation to file a registration statement related to the securities because they were not an original issuer of the security.  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 569 (1995) ("[B]y and large, only public offerings by an issuer of a security, or by controlling shareholders of an issuer, require the preparation and filing of registration statements." (citing 15 U.S.C. §§ 77d, 77e, 77b(11) (2012))).  Moreover, even if such an obligation existed, IPL has provided no evidence that the securities that Defendants purportedly purchased on behalf of IPL were not, in fact, registered already.  Consequently, IPL's claim cannot, as a matter of law, proceed under the first basis for liability set forth in 15 U.S.C. § 77l(a)(1).

61.     IPL also cannot proceed under the second basis for liability, set forth in 15 U.S.C. § 77l(a)(2).  That portion of the statute notes that "any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, *by means of a prospectus or oral communication*, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading" could be liable to the purchaser of the security.  *Id.* at § 77l(a)(2) (emphasis added).  Setting aside the fact that no security purchases were ever made by Defendants, the Supreme Court has held that 15 U.S.C. § 77l(a)(2) reaches only public offerings by an issuer or its controlling

shareholder; not aftermarket, over-the-counter secondary transactions.  *See Gustafson*, 513

U.S. at 577 (1995) ("[W]e have noted [that] § 12(2) contains language, *i.e.*, 'by means of

a prospectus or oral communication,' that limits § 12(2) to public offerings.").  Moreover,

the term "oral communication" is restricted to communications that relate to a prospectus.

*Id.* at 567–68 (acknowledging with approval that the courts of appeals agreed the phrase

"oral communication" is "restricted to oral communications that relate to a prospectus"

(citations omitted)).  Defendants are not issuers or controlling shareholders of an issuer

(and, in any event, IPL has not alleged as much).  Furthermore, IPL has not alleged any

communications made by Defendants related to a formal prospectus.  Consequently, IPL

cannot recover under the second track set forth in 15 U.S.C. § 17l(a) either.

62.     Accordingly, the Court holds that IPL has failed to state a claim under 15

U.S.C. § 77l against Defendants and will not grant IPL default judgment on count 2.


### 3.     Count 3 – Violation of 15 U.S.C. § 78t

63.     In count 3 of its complaint, IPL asserts that Broussard violated Section 20(a)

of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78t, because she is a

"controlling person" within the meaning of the Act and was in control over Contenta when

Contenta violated Section 10(b) of the Act and SEC Rule 10b-5.  (Compl. [Doc. No. 1] at

17–18.)

64.     Pursuant to 15 U.S.C. § 78t(a), "[e]very person who, directly or indirectly,

controls any person liable under any provision of this chapter or of any rule or regulation

thereunder shall also be jointly and severally with and to the same extent as such controlled

person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

65.     This section of the Securities Exchange Act "establishes control-person liability of those who, subject to certain defenses, 'directly or indirectly' control a primary violator of the federal securities laws." *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128 (8th Cir. 2019) (citation omitted). To demonstrate control-person liability, a plaintiff must prove "(1) that a 'primary violator' violated the federal securities laws; (2) that 'the alleged control person actually exercised control over the general operations of the primary violator'; and (3) that 'the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated.' " *Lustgraaf*, 619 F.3d at 873 (citation omitted). The Eighth Circuit applies a liberal construction to the meaning of the word "control," interpreting it as requiring "only some indirect means of discipline or influence short of actual direction" to hold a controlling person liable. *Id.* at 873 (citing *Farley v. Henson*, 11 F.3d 827, 836 (8th Cir. 1993) (internal quotation marks omitted).

66.     Still, "a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct . . . ." *In re Alstom SA*, 454 F. Supp. 2d 187, 210–11 (S.D.N.Y. 2006). As noted above, Broussard and Contenta are legally indistinct from each other and, together, violated Section 10(b) and Rule 10b-5. The indivisible nature of Defendants is a fact that is relevant when a claim—like a controlling person claim—requires two separate entities: the controller and the controlled. "Where, as here,

the defendant is alleged to be primarily liable for violations of the securities laws," and indeed has been proven to be directly liable, "it makes no sense to assert secondary liability under Section[] . . . 20(a)" because "[a] person cannot be both the controller and the controlled." *In re Regal Commc'ns Corp. Securities Litig.*, No. 94-179, 1996 WL 411654, at *4 (E.D. Penn. July 17, 1996). Consequently, the Court holds that Broussard cannot be found liable as a controlling person and will not grant default judgment on count 3.

### 4. Count 4 – Violation of 15 U.S.C. § 77o

67. In count 4 of its complaint, IPL asserts that Broussard violated Section 12(a) of the Securities Act of 1933, codified at 15 U.S.C. § 77o. (Compl. [Doc. No. 1] at 18.) Much like its "controlling person" claim under count 3, IPL asserts that Broussard possessed direct and indirect control over Contenta and did in fact exercise such control when Contenta violated Section 12(a) of the Securities Act. (*Id.* at 18–19.) Due to the Court's prior holding that Defendants are not liable under 15 U.S.C. § 77l (count 2), however, the Court holds as a matter of law that Broussard is not liable as a "controlling person" under 15 U.S.C. § 77o because there is no underlying violation to which controlling person liability could attach. *See Farley*, 11 F.3d at 835 (noting that Section 77o targets those who control violators of 15 U.S.C. § 77l); *see also Musick, Peeler & Garrett v. Emp'rs. Ins. of Wausau*, 508 U.S. 286, 296 (1993) (noting that Section 15 of the Securities Act of `1933 "impose[s] derivative liability only"); *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.2d 85, 99 (2d Cir. 2017) (" 'To establish [Section] 15 liability, a plaintiff must show a 'primary violation' of [Section 12] and control of the primary violator by defendants.' " (emphasis in original) (quoting *In re*

*Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011))).  Accordingly, the Court will not grant default judgment on count 4.

### 5.     Count 5 – Violation of 15 U.S.C. § 80b-1 *et. seq.*

68.     In count 5 of its complaint, IPL asserts that Defendants violated the Investment Advisers Act of 1940, codified at 15 U.S.C. § 80b-1 *et. seq.*  (Compl. [Doc. No. 1] at 19.)  Specifically, IPL contends that Defendants each qualify as "advisers" pursuant to the Act, and that each received compensation and were engaged in the business of providing investment advice to others and IPL.  (*Id.* at 19–20.)  As advisers, IPL alleges that Defendants owed a broad fiduciary duty to IPL, as well as an obligation to provide suitable investment advice and not act in their own interest to the detriment of IPL's investment funds.  (*Id.* at 20–21.)  In violation of these obligations, and through instrumentalities of interstate commerce, IPL alleges that Defendants failed to disclose any conflicts of interest been IPL and Defendants, failed to obtain any written consent regarding any actual or potential conflicts of interest, threatened to impose an early termination fee when IPL sought to end its relationship with Defendants, and blatantly stole its investment funds.  (*Id.* at 7–8, 19, 21–23.)

69.     The Supreme Court has held that there exists a "limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979).  To the extent rescission is warranted, "the rescinding party may of course have restitution of the consideration given under the contract, less any value conferred by the other party," but may not recover any

"compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction . . . ." *Id.* at 24 n.14.

70. Pursuant to 15 U.S.C. § 80b-2(a)(11), an "[i]nvestment adviser" subject to the Act is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . ." A "person" includes both natural persons and companies. 15 U.S.C. § 80b-2(a)(16). The Act was "designed to apply to those persons engaged in the investment-advisory profession-those who provide personalized advice attuned to a client's concerns, whether by written or verbal communication," or, put another way, those who "offer individualized advice attuned to any specific portfolio or to any client's particular needs." *Lowe v. S.E.C.*, 472 U.S. 181, 207–208 (1985). It is unlawful for "any investment adviser . . . to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser" unless that adviser is registered with the SEC. 15 U.S.C. § 80b-3(a).

71. Aside from the registration requirement, it is also unlawful for any investment adviser, by use of the mails or any means of instrumentality of interstate commerce, directly or indirectly "to employ any device, scheme, or artifice to defraud any client or prospective client; [] to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . [or] [] to

engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1)–(2), (4).

72. Pursuant to 15 U.S.C. § 80b-15(b) (Section 215(b) of the Investment Advisers Act), "[e]very contract made in violation of *any provision of this subchapter* and every contract heretofore or hereafter made, the performance of which *involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter* . . . shall be void [] as regards the rights of any person who, in violation of any such provision . . . shall have made or engaged in the performance of any such contract . . . ." (Emphasis added.) By declaring certain contracts void, Congress "intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortg. Advisors, Inc.*, 444 U.S. at 19. "A § 215 claim may be premised upon a violation of *any* provision of the [Investment Advisers Act]." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1036 (2d Cir. 1992) (emphasis added).

73. IPL has established that it entered into an Investment Advisory Agreement with Defendants on February 11, 2015, in reliance upon Defendants' representations that Broussard was a registered investment adviser and that both Defendants were skilled investment specialists. (Compl. [Doc. No. 1] at 7.)

74. IPL has established that Defendants are investment advisers for the purposes of the Act. Both Defendants "received compensation . . . in connection with . . . [the] management of [IPL's] investment account" and both were "compensated for alleged services rendered to [IPL's] account in connection with the management and supervision

of [IPL's] investment corpus and cash/equities . . . ." (*Id.* at 19–20; *see* Agreement [Doc. No. 1-1] at 4 (noting that Contenta and Broussard would provide "investment management and account administration services" and "investment advisory and consulting services" directly to IPL).)

75.     IPL has also demonstrated that Defendants, despite falling under the auspices of the Act, were not registered with the SEC in violation of 15 U.S.C. § 80b-3(a). (*See* Compl. [Doc. No. 1] at 15 (alleging that "none of the Defendants were registered with the State of California or any other state to sell securities or provide investment advice"), 14 (referencing and attaching Broussard indictment); Broussard Indictment [Doc. No. 1-2] at 5 (noting that "[d]espite BROUSSARD's representations to [IPL] that she was a Registered Investment Advisor, she was not in fact a Registered Investment Adviser at any point in the time period during which she purported to oversee [IPL's] funds"); Plea Agreement, *United States v. Broussard*, No. 3:19-CR-00029 (TAV/DCP) [Doc. No. 25] at 3 ("The defendant was not a Registered Investment Adviser at any point during the time period in which she purported to oversee the Sorority's funds.").)

76.     IPL has also established that Defendants, through interstate commerce, directly "employ[ed] [a] device, scheme, or artifice to defraud" IPL, engaged in a "course of business which operates as a fraud or deceit upon" IPL, and engaged in acts, practices, and courses of business that were "fraudulent, deceptive, [and] manipulative." 15 U.S.C. § 80b-6(1)–(2), 4. The same facts which establish Defendants' violations of Section 10(b) and Rule 10b-5 also establish the scheme and fraudulent business practices under the Investment Advisers Act. As noted above, Defendants held themselves out as investment

advisers, did not register with the SEC, and induced IPL to hand over investment funds to Defendants for investment purposes under an Investment Advisory Agreement. Defendants then simply stole IPL's funds for their own benefit. Accordingly, the Court finds that Defendants have violated several provisions of the Investment Advisers Act and will grant IPL default judgment on count 5.

### 6. Summary

77. For the reasons stated above, the Court finds that IPL is entitled to default judgment on counts 1 (Section 10(b) and Rule 10b-5), and 5 (Investment Advisers Act), but not counts 2 (Section 12(a)), 3 (Section 20(a) controlling person), and 4 (Section 12(a) controlling person).

## III. DAMAGES

78. As noted above, factual allegations in the Complaint—other than those relating to the amount of damages—are accepted as true.

79. Default judgment does not automatically entitle a party to any damages. *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818–19 (8th Cir. 2001) (citing *N. Cent. Co. v. Phelps Aero, Inc.*, 139 N.W.2d 258, 263 (Minn. 1965)). Rather, the Court must undertake an independent analysis of damages, understanding that recovery may not take place unless and until the amount claimed "is a liquidated sum or one capable of mathematical calculation." *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). While it is IPL's duty to prove damages, "any doubts regarding the computation of damages must be resolved against Defaulting Defendants due to their default." *Core Distribution, Inc. v. Doe 1*, No. 16-CV-04059 (SRN/HB), 2018 WL 6178720, at *7 (D.

Minn. Nov. 27, 2018) (citing *Keystone Global LLC v. Auto Essentials, Inc.*, No. 12-CV-9077 (DLC), 2015 WL 224359, at *5 (S.D.N.Y. Jan. 16, 2015)). To that end, damages "may not be based on mere speculation or guess" but may be approximate so long as "the evidence shows the extent of the damages as a matter of just and reasonable inference . . . ." *IPVX Patent Holdings, Inc. v. Taridium, LLC*, No. 12-CV-5251, 2014 WL 4437294, at *3 (E.D.N.Y. Aug. 6, 2014) (citation omitted) (internal quotation marks omitted).

80. IPL seeks a total of $1,314,717.81 in damages. (IPL Corrected Mot. for Default J. [Doc. No. 21] at 1.) More specifically, and by category, IPL seeks compensatory damages in the amount of $106,000, consequential damages in the amount of $83,810.83, and punitive damages in the amount of $1,126,900.98. (IPL Mem. [Doc. No. 16] at 5–23.) The Court addresses each category in turn.

### A. Compensatory Damages

81. Actual damages are permitted in a securities fraud case under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5. *See Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) ("[T]his Court has noted that 'Section 28(a) of the 1934 Act . . . limits recovery in any private damages action brought under the 1934 Act to 'actual damages[.]' ' " (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 (1975)); *see also Harris v. Union Elec. Co.*, 787 F.2d 355, 367 (8th Cir. 1986) ("In securities fraud cases, damages are determined in accordance with the extent to which a plaintiff is actually damaged as a result of the defendant's fraudulent conduct." (citation

omitted)), *cert. denied*, 479 U.S. 823 (1986). Similarly, actual damages are permitted in cases involving intentional fraud by a fiduciary under California law, *see Hensley v. McSweeney*, 109 Cal. Rptr. 2d 489, 492 (Cal. Ct. App. 2001) (noting the appropriate measure is "out of pocket" damages), and breach of contract under California law, *see* Cal. Civ. Code § 3300 (West 2019) (noting the appropriate measure is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom").[4]

82.    Here, the Court finds that IPL has proven its request for, and is entitled to, $106,000 in compensatory damages. The organization has provided copies of the checks and wire transfers illustrating its transfer of $100,000 in investment funds to Defendants under the Investment Advisory Agreement, as well as its transfer of $6,000 in management fees. (*See* Ward Decl. Ex. 3 [Doc. No. 18-3] ($3000 management fee for 2015); Ward Decl. Ex. 4 [Doc. No. 18-4] ($100,000 investment funds); Ward Decl. Ex. 5 [Doc. No. 18-5] ($3,000 management fee for 2016).) These damages constitute out-of-pocket harm to IPL, and consequently, IPL is entitled to $106,000 in compensatory damages.

**B.    Consequential Damages**

83.    IPL also requests $87,810.83 in consequential damages, which it asserts is the benefit it would have obtained had Defendants been managing IPL's portfolio as reflected in the fraudulent financial reports that Defendants routinely sent to IPL. (*See* IPL Mem. [Doc. No. 16] at 11.)

---

[4]    The Court will not discuss the measure of damages for every count because several of the claims provide, on their own, most of the damages that IPL seeks.

84.     For two reasons, the Court finds that even if IPL has an adequate legal basis for consequential damages, it has failed to establish the precise amount with sufficient evidence.  First, IPL relies in part on Defendants' purported financial statements to establish a right to consequential damages.  However, IPL simultaneously asserts—and the Court has accepted as true—that those financial portfolio statements are false.  The Court will not base any calculation of damages on documents that have been proven to be entirely fraudulent.  Second, IPL's only non-fraudulent proof of its purported consequential damages comes in the form of a one-page spreadsheet prepared by IPL's former treasurer. (*See* Jowers Decl. [Doc. No. 19] at 1–2; Jowers Decl. Ex. 7 [Doc. No. 19-1].)  IPL asserts that the spreadsheet demonstrates the increased value of the stocks IPL would have owned had Defendants invested its funds as contemplated under the Investment Advisory Agreement.  (IPL Mem. [Doc. No. 16] at 10–11.)  However, IPL provides no factual basis for the historical pricing listed in the spreadsheet.  Moreover, a cursory search of historical stock prices indicates that at least some of the values in the spreadsheet are incorrect.  As such, even assuming a single spreadsheet like the one provided could form an adequate basis for consequential damages, and  further assuming consequential damages are even appropriate, IPL has failed to meet its burden to provide sufficient "evidence show[ing] the extent of the damages as a matter of just and reasonable inference . . . ."  *IPVX Patent Holdings, Inc.*, 2014 WL 4437294, at *3 (citation omitted) (internal quotation marks omitted).

## C.     Punitive Damages

85.     Under California law, punitive damages are permitted for breach of "an obligation not arising from contract, where it is proven by clear and convincing evidence that defendant has been guilty of oppression, fraud, or malice . . . ."  Cal. Civ. Code § 3294(a) (West 2019).[5]  California law considers punitive damages to be a method of "punishing the defendant."  *Id.*  Most relevant here, the term "fraud" as used in the statute means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  *Id.* at (c)(3).[6]

86.     Here, several of IPL's claims satisfy the standard for awarding punitive damages.  As noted above, IPL has proven that Defendants intentionally defrauded IPL, in addition to breaching their fiduciary duty to the sorority.  *See, e.g.*, *Scott v. Phoenix Schs.,*

---

[5]     Minnesota law also recognizes the right to punitive damages under the facts of this case.  *See, e.g.*, Minn. Stat. § 549.20(a) (2018) (permitting punitive damages upon clear and convincing evidence that defendant acted with "deliberate disregard for the rights or safety of others"); *Jensen v. Peterson*, 264 N.W.2d 139, 145 (Minn. 1978) (permitting punitive damages on malicious intentional fraud claim); *Huebsch v. Larson*, 191 N.W.2d 433, 435 (Minn. 1971) (permitting punitive damages on conversion claim).

[6]     IPL also asserts it is entitled to punitive damages under the Investment Advisers Act.  That is incorrect.  The Supreme Court has sharply curtailed the private right of action under the Investment Advisers Act, and only permits the recovery of the contract consideration paid through rescission.  *See Transamerica Mortg. Advisors, Inc.*, 444 U.S. at 24 n.14 (noting that "the rescinding party may of course have restitution of the consideration given under the contract, less any value conferred by the other party," but may not recover any "compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction . . . .").  Indeed, the Court was expressly worried about indirectly providing "the equivalent of a private damages remedy" that Congress had not conferred through the Act.  *Id.*

*Inc.*, 96 Cal. Rptr. 3d 159, 170 (Cal. Ct. App. 2009) (noting that punitive damages would be appropriate where a breach of fiduciary duty occurred alongside malice, fraud, or oppression); *Horn v. Guaranty Chevrolet Motors*, 75 Cal. Rptr. 871, 875–76 (Cal. Ct. App. 1969) ("Fraud alone is an adequate ground for awarding punitive damages."). Moreover, Defendants converted IPL's funds for their own use, another ground for awarding punitive damages. *See Cyrus v. Haveson*, 135 Cal. Rptr. 246, 253 (Cal. Ct. App. 1976) ("Causes of action for conversion . . . support the award of exemplary damages."). As such, the Court will award punitive damages to IPL.

87. "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted). Specifically, the Due Process Clause of the Fourteenth Amendment "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* (citation omitted). The Court has provided three guideposts for evaluating whether a punitive damages award is acceptable: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citation omitted); *see Dziadek v. Charter Oak Fire Ins. Co.*, 867 F.3d 1003, 1012 (8th Cir. 2017).

88. Of the three guideposts, the most important measure of the reasonableness of a punitive damages award "is the degree of reprehensibility of the defendant's conduct."

*State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419 (citation omitted) (internal quotation marks omitted). Here, the Court finds that Defendants conduct was reprehensible. Defendants deliberately led IPL into believing that they were qualified investment specialists, and that Broussard in particular identified with IPL's mission to "uplift and enhance the scope, outreach, and mission of the organization and . . . [Broussard's] African-American sisters." (IPL Mem. [Doc. No. 16] at 27.) Upon successfully deceiving IPL, Defendants absconded with the organization's funds for their own benefit. There is no evidence Defendants did anything other than deliberately engage in a pattern of misrepresentations and deceit while intending to steal IPL funds.

89. With respect to the second factor, the Supreme Court declined to impose a "bright-line ratio" on punitive damages awards, instead observing that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425. Indeed, the Supreme Court has noted that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ." *Id.* (citation omitted). Here, IPL is asking for a ratio of 6-to-1. In light of the reprehensibility of Defendants' conduct, and in accordance with the Supreme Court's general presumption as to the reasonableness of single-digit ratios for punitive damages awards, the Court finds that ratio to be reasonable.

90. With respect to the third factor, California has "adopted a broad range of permissible ratios—from as low as one to one to as high as 16 to 1—depending on the specific facts of each case." *Bankhead v. ArvinMeritor, Inc.*, 139 Cal. Rptr. 3d 849, 865–

66 (Cal. Ct. App. 2012) (discussing cases in which punitive damages have been affirmed from as low as a one-to-one ratio and as high as a 16-to-1 ratio). IPL's request falls on the low end of that spectrum, does not exceed the Supreme Court's cautionary single-digit ratio presumption, and is reasonable in light of the unique facts of this case. Consequently, the Court grants IPL punitive damages in the amount of $636,000, which is six times its $106,000 compensatory damages award.

### D. Summary

91. The Court awards IPL a total of $742,000 in damages, which consists of $106,000 in compensatory damages, and $636,000 in punitive damages.

## IV. ATTORNEYS' FEES

92. IPL has also requested $19,320 for attorneys' fees. (IPL Corrected Mot. for Default J. [Doc. No. 21] at 1.) In support of its request, IPL relies on federal equitable principles and California statutory law. (*See* IPL Mem. [Doc. No. 16] at 23.) Accordingly, the Court must determine whether there is any basis under either federal law or state law to grant IPL an award of its attorneys' fees. For the following reasons, the Court finds that (1) there is no basis in federal law—statutory or otherwise—for IPL's attorneys' fees claim; and (2) with respect to IPL's state law claims, neither Minnesota law nor California law grants a right to attorneys' fees in this case. Accordingly, the Court denies IPL's request.

93. "Under the bedrock principle known as the American Rule, each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. General Revenue Corp.*, 568 U.S. 371, 382 (2013) (citation omitted) (internal quotation marks omitted). Despite this rule, the Supreme Court has acknowledged that "federal

courts have inherent power to award attorney's fees in a narrow set of circumstances" such as when a party *brings* an action in bad faith, *id.*, when a party's litigation efforts directly benefit a particular group of individuals, when a party has *acted* in bad faith, vexatiously, wantonly, or for oppressive reasons, and when the attorney's fees function as a sanction for willful disobedience of a court order, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). Moreover, where a federal court sits in diversity, and where "state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975).

## A. Federal law does not provide for an award of attorneys' fees

94.     IPL does not assert that any federal statute provides for the right to attorneys' fees in this case. Moreover, the parties' Investor Advisory Agreement does not contain a provision regarding attorneys' fees. Therefore, IPL's sole federal basis for its argument on attorneys' fees is that Defendants' "bad faith conduct . . . *prior to litigation*" warrants a departure from the American Rule. (IPL Mem. [Doc. No. 16] at 27–28 (emphasis added).) IPL argues that Defendants' scheme to defraud IPL was "shocking on its face," particularly because Defendants ensnared IPL by fraudulently identifying with its mission to "uplift and enhance the scope, outreach, and mission of the organization and . . . [Broussard's] African-American sisters." (*Id.* at 27.)

95.     Federal courts possess the inherent authority to depart from the American Rule, and award attorneys' fees as a sanction, where " 'the losing party has acted in bad

faith, vexatiously, wantonly, or for oppressive reasons.' " *Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1435 (8th Cir. 1997) (quoting *Chambers*, 501 U.S. at 45–46). However, "[a] court's inherent power to award attorney fees pursuant to the bad faith exception 'depends not on which party wins the lawsuit, but on how the parties conduct themselves *during the litigation*.' " *Id.* (emphasis in original) (quoting *Chambers*, 501 U.S. at 53). The Eighth Circuit has adopted the view—and this Court must necessarily follow it—that "the district court's inherent power to award attorney fees as a sanction for bad faith conduct *does not extend to pre-litigation conduct*." *Id.* at 1437 (emphasis added).

96.     Here, IPL's federal basis for attorneys' fees rests entirely on Defendants' prelitigation bad faith conduct. However, the Eighth Circuit has held that such conduct cannot form a valid basis for a departure from the American rule on attorneys' fees. Accordingly, there is no federal basis for granting IPL's request for attorneys' fees. The Court now turns to state law to determine whether any state statutes or equitable principles permit an award of attorneys' fees.

**B.      State law does not provide for attorneys' fees**

97.     Where a federal court sits in diversity, and where state law does not conflict with federal law, a state statute providing for (or denying) a right to attorneys' fees should be followed. *See Alyeska Pipeline Serv. Co.*, 421 U.S. at 259 n.31. The Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), has not altered this rule. *Alyeska Pipeline Serv. Co.*, 421 U.S. at 259 n.31 (noting, with respect to the enforcement of state attorney's fees statutes, that the Court saw "nothing after Erie requiring a departure from this result"). Moreover, the Eighth Circuit has held that generally, "[s]tate law governing

attorneys' fees is . . . substantive" for the purposes of the *Erie* doctrine. *Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 852 (8th Cir. 2013). The same rule applies for claims heard under pendent jurisdiction. *See Witzman v. Gross*, 148 F.3d 988, 990 (8th Cir. 1998) ("The *Erie* principles apply equally to pendent jurisdiction.").

98. The fact that state law regarding attorneys' fees is substantive for the purposes of the *Erie* doctrine does not, however, answer the question of whether the issue of attorneys' fees is procedural or substantive for Minnesota *choice of law* principles. *See U.S. Leasing v. Biba Info. Processing Servs. Inc.*, 436 N.W.2d 823, 825–26 (Minn. Ct. App. 1989) (citing *Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn. 1983) ("[M]atters of procedure and remedies [are] governed by the law of the forum state.")).

99. Neither the Minnesota Supreme Court nor the Minnesota Court of Appeals has explicitly addressed whether an award of attorneys' fees is substantive or procedural for choice-of-law purposes. The Court need not resolve that question, however, because it finds that regardless of whether the issue is substantive or procedural, there is no conflict between Minnesota and California law on attorneys' fees, at least not with respect to this case. IPL relies on Cal. Civ. Proc. Code § 1033.5 (West 2019) for the assertion that attorneys' fees are costs, and that IPL is entitled to its costs. (IPL Mem. [Doc. No. 16] at 23.) However, the provision IPL cites states that "[a]ttorney's fees" are only costs when "authorized by . . . [c]ontract[,] [s]tatute[, or] [l]aw." Cal. Civ. Proc. Code § 1033.5(a)(10). Moreover, Cal. Civ. Proc. Code § 1021 (West 2019) states that attorneys' fees are only recoverable where "specifically provided for by statute" or under an agreement "express or implied" between the parties. The California Supreme Court has held that § 1021

53

"codifies" the "American rule" that "each party to a lawsuit ordinarily pays its own attorney fees." *Mountain Air Enters., LLC v. Sundown Towers LLC*, 398 P.3d 556, 560–61 (Cal. 2017). Minnesota follows the same rule: "attorney fees are permitted if authorized by contract or statute." *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 987 (8th Cir. 2008) (citing *Int'l Bhd. Of Elc. Workers v. City of St. Cloud*, 750 N.W.2d 307, 316 (Minn. Ct. App. 2008)).

100. Here, there is no contractual provision authorizing attorneys' fees in favor of IPL. Moreover, IPL points to no California statute—other than § 1033.5, which does not provide for attorneys' fees as a matter of right—granting it a right to attorneys' fees under its state law claims. The Court has not found an applicable Minnesota statute authorizing attorneys' fees for IPL. Accordingly, the Court considers only whether an equitable right to attorneys' fees would be recognized in this case under either Minnesota or California law.

101. IPL asserts that the "Tort of Another" doctrine applies. However, the "Tort of Another" doctrine applies only where a plaintiff is required to employ counsel to "prosecute or defend an action *against a third party because of* the tort of the defendant." *Gray v. Don Miller & Assocs., Inc.*, 674 P.2d 253, 257 (Cal. 1984) (emphasis added) (citation omitted); *see Prior Lake State Bank v. Groth*, 108 N.W.2d 619, 622 (Minn. 1961) (same). Here, IPL has sued only the Defendants; no third party is involved in any way. Consequently, the "tort of another" doctrine is inapplicable.

102. For the reasons above, the Court denies IPL's request for attorneys' fees.

## V. COSTS

103.    IPL also seeks to recover $734.00 in costs independent of its request for attorneys' fees.  (*See* IPL Corrected Mot. for Default J. [Doc. No. 21] at 1.)  IPL appears to rely on California law for its request for costs.  (*See* IPL Mem. [Doc. No. 16] at 23.)

104.    California law on costs does not apply in the present action.  The United States Supreme Court has consistently held that "if a matter is covered by a Federal Rule the federal courts must apply the Rule without regard to whether the matter might arguably be labeled substantive or procedural."  *Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1258 (8th Cir. 1996) (citation omitted).  Consequently, a "full-blown *Erie* analysis . . . does not apply if the matter in question is covered by a Federal Rule of Civil Procedure."  *Id.* Moreover, "federal courts must apply a Federal Rule to a matter within its scope even where [the Federal Rule] differs from a state rule and could lead to a different outcome." *Id.* (citing *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 6 (1987)).  In the present case, Federal Rule of Civil Procedure 54(d)(1) applies to the recovery of costs other than attorneys' fees, and therefore must be applied by the Court.

105.    Pursuant to Fed. R. Civ. P. 54(d)(1), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—*should* be allowed to the prevailing party."  (Emphasis added.)  The term "costs" is defined by 28 U.S.C. § 1920 (2012).  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 556 U.S. 560, 565 (2012) ("We have held that '§ 1920 defines the term 'costs' as used in Rule 54(d).' " (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987))).  Section 1920, in turn, permits a judge to award fees (1) of the clerk and marshal, (2) for printed or electronically recorded

transcripts necessary for a case, (3) for printing and witnesses, (4) for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case, (5) for docket fees under 28 U.S.C. § 1923, and (6) for compensation of court-appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services. 28 U.S.C. § 1920. Notably, however, a party seeking costs under § 1920 must file a bill of costs. *Id.* Additionally, "[b]efore any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent . . . that such item is correct and has been *necessarily incurred* in the case and that the services for which fees have been charged were *actually and necessarily* performed." 28 U.S.C. § 1924 (2012). Pursuant to D. Minn. Local Rule 54.3(c)(1), where a party seeks costs under Fed. R. Civ. P. 54(d)(1), that party, "[*w*]*ithin 30 days after judgment is entered* . . . must file and serve a verified bill of costs using a form available from the clerk."

106. Here, IPL's request for costs is at the very least premature, in addition to lacking required information. Judgment will be entered as of the date below. Consequently, the 30-day clock to file a verified bill of costs starts as of that date and IPL's request for costs is, at this point in time, premature. Even if its request was not premature, IPL has not provided a bill of costs on a form provided by the clerk, and the only verification provided by IPL of the costs it seeks to recover are a few receipts for investigative and service-of-process costs, as well as an affidavit filed by its attorney attesting that the costs were reasonable and *associated* with the work product in the case, not that they were necessarily incurred for the litigation. (*See* Supp. Ward Decl. [Doc. No.

20] at 2–3 ("The billing invoices attached represent the reasonable hours expended and the reasonable costs associated for the work product generated in this matter."); Supp. Ward Decl. Ex. 13 [Doc. No. 20-1] at 3, 6; *see also* Ward Decl. Exs. 10–12 [Doc. Nos. 18-10, 18-11, 18-12] (receipts for costs of various services).)  Consequently, the Court declines to award costs at this time.  If IPL wishes to recover its costs under Fed. R. Civ. P. 54(d)(1), it must file a verified bill of costs using a form provided by the clerk within 30 days from the date of judgment and support that bill with sufficient documentation.

## VI.    PRE- & POSTJUDGMENT INTEREST

107.    IPL also seeks pre- and postjudgment interest on its claims.  It argues, under California law, that it is entitled to a 10% prejudgment interest rate per annum beginning February 11, 2017 until the date of judgment for its damages stemming from its contract claims, a 7% prejudgment interest rate per annum from the same date for its non-contract claims, and a 10% postjudgment interest rate per annum on its entire judgment.  (IPL Mem. (Doc. No. 16) at 28–29, 32).  In support of its argument, IPL points to *Berry & Berry, Inc. v. Madera Hotel LLC*, No. F075645, 2019 WL 2004838, at *11 (Cal. Ct. App. May 7, 2019), *In re UC Lofts on 4th, LLC*, Nos. 05-15409-CL7, 05-15410-CL7, 2014 WL 1285415, at *25 (Bankr. S.D. Cal. Mar. 27, 2014), *affirmed*, 2015 WL 5209252 (B.A.P. 9th Cir. Sept. 4, 2015), as well as Cal. Civil Code §§ 3287, 3288 (West 2019) (setting forth prejudgment interest rules), Cal. Const. art. 15, § 1 (noting that where the Legislature is silent on a rate of interest for a judgment, the rate shall be 7% per annum), and Cal. Civ. Proc. Code §§ 685.010, .020 (West 2019) (setting forth postjudgment interest rate at 10%).

108.    For the following reasons, the Court holds that: (1) Eighth Circuit precedent and Minnesota choice-of-law principles require it to apply Minnesota *procedural* law with respect to prejudgment interest for IPL's state and federal claims; and (2) Eighth Circuit precedent compels the Court to apply federal law regarding postjudgment interest.

### A.    Prejudgment Interest

109.    In *Mansker v. TMG Life Insurance Company*, the Eighth Circuit explained that " '[t]he question of whether interest is to be allowed, and also the rate of computation, is a question of federal law *where the cause of action arises from a federal statute*.' " 54 F.3d 1322, 1330 (8th Cir. 1995) (emphasis added) (quoting *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir. 1981), *cert. denied*, 454 U.S. 968 (1981)).  Moreover, " 'the award of prejudgment interest, in the absence of statutory directives, rests in the discretion of the district court.' "  *Cargill, Inc. v. Taylor Towing Serv., Inc.*, 642 F.3d 239, 241–42 (8th Cir. 1981) (citation omitted).  Courts generally award prejudgment interest when "damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal" by the party who should have paid.  *Id.* at 242 (citation omitted).  In making a determination regarding the applicable rate of prejudgment interest, federal courts look to federal law in cases arising under federal law, *Mansker*, 54 F.3d at 1330, keeping in mind that an award of prejudgment interest is intended to serve at least two purposes: "[1] to compensate prevailing parties for the true costs of money damages incurred, and, [2] where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation,"

*Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986) (citation omitted).

110.     In discussing what rate of prejudgment interest to apply, however, the Eighth Circuit has also held that "while federal law governs the issue of interest and its rate" for federal question claims, "state law should be incorporated in the determination of the proper rate to be allowed, once an independent finding is made concerning whether any prejudgment interest should be awarded." *Dependahl*, 653 F.2d at 1219.  Consequently, when prejudgment interest is awarded and the case involves both state and federal claims, the Court will generally apply state law prejudgment interest rates so long as it fulfills the twin aims of prejudgment interest awards.

111.     The Court finds that prejudgment interest is warranted here.  As a result of Defendants' misrepresentations and conduct, IPL lost $106,000 which could have accrued interest through different financial opportunities.  Prejudgment interest compensates IPL for the "true costs of money damages," which includes the lost interest it would have accrued on the funds even assuming it had not invested them.  *Cf. Stroh Container Co.*, 783 F.2d at 752 (noting that one purpose of prejudgment interest is to "compensate prevailing parties for the true costs of money damages incurred").  Moreover, while the other primary aim of prejudgment interest—to promote settlement and thereby inhibit one party's ability to benefit from litigation delays, *cf. id.*—is less applicable here in the context of a default judgment, the Court still considers prejudgment interest to be necessary to remedy the true cost inflicted upon IPL by Defendants.  Consequently, the Court will award prejudgment interest to IPL for its federal claims.

112.     Because the Court is granting an award of prejudgment interest for its federal claims, it must determine an appropriate prejudgment interest rate, which requires it to look to what rate Minnesota would apply. *See Dependahl*, 653 F.2d at 1219.  Additionally, with respect to IPL's state law claims, where the Court hears claims based on pendent or diversity jurisdiction, "[p]rejudgment interest is a substantive matter of state law for the purposes of Erie." *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007).  Both questions require this Court to examine how Minnesota courts would approach prejudgment interest questions.

113.     Looking to Minnesota law raises the further question of *which* state's prejudgment interest law should apply, which is determined by looking to conflict-of-law principles of the state where the district court sits.  *Id.* at 595–96 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co.*, 325 F.3d 1024, 1027 (8th Cir. 2003)).  Even where another state's substantive law may apply, Minnesota courts apply Minnesota law regarding matters of *procedure* and remedies.  *See U.S. Leasing*, 436 N.W.2d at 825–26 (citation omitted).

114.     Minnesota considers prejudgment interest to be a procedural issue for purposes of choice-of-law.  *Schwan's Sales Enters., Inc.*, 476 F.3d at 596–97 (citing *Zaretsky*, 464 N.W.2d at 548–51).  Accordingly, as the Eighth Circuit has acknowledged, "the issue of prejudgment interest—a matter of substantive law for Erie purposes—is a procedural matter for conflict-of-laws purposes under Minnesota law" and therefore "Minnesota's prejudgment interest statute applies in the absence of a choice-of-law provision that expressly governs procedural matters." *Id.* at 597.  Here, there is no choice-

of-law provision governing prejudgment interest in the Investment Advisory Agreement, much less any clause delineating a preference for another state's procedural law on the subject. As such, the Court looks to Minnesota law on prejudgment interest. *See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, No. 09-CV-3037 (SRN/LIB), 2014 WL 1257430, at *4 (D. Minn. Mar. 11, 2014) ("[B]ecause the Contract's choice-of-law provision does not expressly refer to remedies, Minnesota law regarding the prejudgment interest rate shall apply."); *see also In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 497 (6th Cir. 2013) (affirming application of higher state statutory interest rate where Defendant was found liable under both federal and state fraud claims).

115.     Minnesota's rules on prejudgment interest are set forth in statute. *See* Minn. Stat. § 549.09 (2018). Minnesota mandates a 10% flat prejudgment interest rate—regardless of the type of claim—where the damages are over $50,000. Minn. Stat. § 549.09, subd. 1(c)(2). Notably, however, interest may not accrue on any portion of judgments or awards based on "future damages," "punitive damages, fines, or other damages that are noncompensatory in nature," or any "portion of any verdict, award, or report which is founded upon interest, or costs, disbursements, attorney fees, or other similar items added by the court . . . ." *Id.* at subd. 1(b)(2), (3), (5).

116.     Minnesota requires that prejudgment interest be calculated from either "the time of commencement of the action . . . or the time of a written notice of claim, whichever occurs first" although in order to claim interest from the date of a written notice of claim, "[t]he action must be commenced within two years of a written notice of claim . . . ." Minn. Stat. § 549.09, subd. 1(b). Minnesota courts have not precisely defined the meaning of

"written notice of claim," but other decisions from this Court have held that it means something akin to a "demand for payment (or other similar assertion) contained in a writing." *Creekview of Hugo Ass'n, Inc. v. Owners Ins. Co.*, 386 F. Supp. 3d 1059, 1068 (D. Minn. 2019) (citing *Gen. Mills Ops., LLC v. Five Star Custom Foods, Ltd.*, 845 F. Supp. 2d 975, 978 (D. Minn. 2012); *Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc.*, No. 04-CV-4699 (JRT/FLN), 2008 WL 4527816, at *9 (D. Minn. Sept. 29, 2008) (noting that the demand aspect is important because it provides clarity that "an injured party will be seeking relief").

117.   Because IPL commenced this action on March 5, 2019, if it wishes to claim an earlier date for prejudgment interest, its written demand for payment must have occurred no earlier than March 5, 2017.   However, IPL argues that it is entitled to prejudgment interest from February 11, 2017, when it provided Defendants with notice of its intent to terminate the Investment Advisory Agreement.   (*See* IPL Mem. [Doc. No. 16] at 16; Compl. [Doc. No. 1] at 9.)   Even assuming the February 2017 notice constituted a written demand for payment—which this Court cannot evaluate because no copy of the notice has been provided—it falls outside of the two-year window contemplated by Minn. Stat. § 549.09, subd.1(b).   And IPL has not provided any information as to any other date that would form an adequate start time for prejudgment interest.   Indeed, without copies of the purported demands, this Court cannot say that any communication during 2017 satisfied the "written notice of [a] claim" requirement under Minn. Stat. § 549.09.   Therefore, the date IPL commenced this action must be used to calculate prejudgment interest.   *See* Minn. Stat. § 549.09, subd. 1(b).

118.     As noted above, the statute provides that for "a judgment or award over $50,000 . . . the interest rate shall be ten percent per year until paid." *Id.* at subd. 1(c)(2). The statute expressly excludes from this judgment or award any amount based on based on "future damages," "punitive damages, fines, or other damages that are noncompensatory in nature," or any "portion of any verdict, award, or report which is founded upon interest, or costs, disbursements, attorney fees, or other similar items added by the court . . . ." *Id.* at subd. 1(b)(2), (3), (5). Here, the Court has found adequate evidence to support $106,000 in compensatory damages, which includes the $100,000 invested with Defendants and the $6,000 management fees paid to Defendants. Under Minnesota law, IPL is not entitled to prejudgment interest on its punitive damages or its costs. Consequently, IPL is entitled to prejudgment interest at a rate of 10% per year from March 5, 2019 through the date of judgment below on $106,000 in compensatory damages.

119.     The applicable formula is:

[$106,000 x 0.1] ÷ 365 = $29.04 daily rate of interest

($29.04) x (# of days between March 5, 2019 and judgment)

120.     There are 205 days between March 5, 2019 and September 26, 2019. Therefore, IPL is entitled to $5,953.20 in prejudgment interest on its state and federal claims.

## B.     Postjudgment Interest

121.     Unlike prejudgment interest, the Eighth Circuit has held that even where an action in federal court is based on diversity of citizenship, the rate of postjudgment interest is set according to 28 U.S.C. § 1961 (2012), which covers "any money judgment in a civil

case recovered in a district court" and provides for "interest from the date of judgment at a floating rate determined by the coupon yield of United States Treasury bills." *Mobil Expl. & Producing N. Am., Inc. v. Graham Royalty Ltd.*, 910 F.2d 504, 509 (8th Cir. 1990) (quoting 28 U.S.C. § 1961(a) (1990)). Consequently, because this action involves both federal claims and claims that fall under diversity and supplemental jurisdiction, 28 U.S.C. § 1961 must be applied to calculate the rate of postjudgment interest in this case. *Mobil Expl. & Producing N. Am., Inc.*, 910 F.3d at 509; *cf. Alby v. BNSF Railway Co.*, 918 N.W.2d 562, 569 (Minn. Ct. App. 2018) (concluding that postjudgment interest is "substantive" for FELA claims because it constitutes a proper measure of damages).

122. Section 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The rate of interest shall be calculated at a "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of judgment." *Id.* Interest must be "compounded daily to the date of payment . . . and shall be compounded annually." *Id.* at (b). Moreover, postjudgment interest may accrue on costs and punitive damages. *See Bank S. Leasing, Inc. v. Williams*, 778 F.2d 704, 705–706 (11th Cir. 1985) (noting that postjudgment interest is permitted on punitive damages under § 1961(a)); *R.W.T. v. Dalton*, 712 F.2d 1225, 1234–35 (8th Cir. 1983) (permitting postjudgment interest on costs), *rev. denied*, 464 U.S. 1009 (1983), *abrogated on other grounds*, *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837–38 (1990).

123. Because the Court is permitting IPL to seek its costs after judgment has been entered, it cannot determine the rate of postjudgment interest at this time. Accordingly, the Court directs IPL to file a motion for postjudgment interest after the date of judgment below demonstrating, pursuant to 28 U.S.C. § 1961(a), the appropriate rate of postjudgment interest.

## ORDER

Based on the foregoing findings of fact and conclusions of law, the Court hereby makes the following Order:

1.  Iota Phi Lambda's Corrected Motion for Entry of Default Judgment [Doc. No. 21] against Contenta Global Capital Group and Cheryl Broussard is granted with respect to counts 1, 5, 6, 7, 9, 12, 15, and 16. The Motion is denied with respect to counts 2, 3, 4, 8, 10, 11, 13, and 14;

2.  A Default Judgment is entered against Contenta Global Capital Group and Cheryl Broussard and in favor of Iota Phi Lambda in the amount of $747,953.20. Each portion of the award is as follows:

    a.  Compensatory Damages — $106,000

    b.  Prejudgment interest on compensatory damages — $5,953.20

    c.  Punitive Damages — $636,000

3.  Iota Phi Lambda's request for attorneys' fees is denied.

4.  Iota Phi Lambda's request for costs is denied at this time without prejudice. Pursuant to local rules, Iota Phi Lambda has 30 days from the date of judgment to file an appropriate verified bill of costs.

5.      Iota Phi Lambda's request for postjudgment interest is denied at this time without prejudice. IPL is directed to file a motion following this judgment demonstrating the appropriate rate of postjudgment interest in light of the above award and, assuming IPL seeks its costs, any updated request for costs.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: September 26, 2019                s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge